SO ORDERED.

SIGNED this 1 day of May, 2013.

_J. Rich Leonard_
**J. Rich Leonard**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

IN RE:

**TANGLEWOOD FARMS, INC. OF ELIZABETH CITY,**

    **DEBTOR.**

**CASE NO. 10–06719–8–JRL**

**CHAPTER 7**

---

**JAMES B. ANGELL, CHAPTER 7 TRUSTEE,**

    **PLAINTIFF,**

      **v.**

**MEHERRIN AGRICULTURAL & CHEMICAL COMPANY AND CNH CAPITAL AMERICA LLC,**

    **DEFENDANTS.**

**ADVERSARY PROCEEDING NO. 12–00186–8–JRL**

---

## ORDER

This matter came before the court on the motion to dismiss this adversary proceeding, filed by Meherrin Agricultural & Chemical Company ("defendant"), which James B. Angell ("trustee") has opposed. A hearing on the matter was held on March 1, 2013 in Raleigh, North Carolina. At

1

the conclusion of the hearing, the court took the matter under advisement.

## BACKGROUND[1]

On August 20, 2010, Tanglewood Farms, Inc. of Elizabeth City ("debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which was subsequently converted to one under chapter 7 on July 12, 2011. The debtor, a granary operation in Pasquotank County, North Carolina, was operated by its president and sole shareholder, James Howard Winslow ("Mr. Winslow"). As its president, Mr. Winslow oversaw the granary, facilitating the exchange of corn, wheat, and soybeans (collectively "grain") between the debtor, his personal farming operation, Winslow Farms, and third–party grain purchasers and suppliers.[2] Mr. Winslow sold the majority of grain produced by Winslow Farms to the debtor for fair market value. Mr. Winslow and his wife, Billie Reid Winslow (collectively "Winslows") filed a joint voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 23, 2010.

The defendant is one of several creditors that filed proofs of claim in both the debtor's case and the Winslows' individual case. Three promissory notes were executed in favor of the defendant by Mr. Winslow, individually and as the president of the debtor, and Mrs. Winslow, which provided

---

[1]These facts are a fair recitation of the allegations in the complaint, which is viewed in a light most favorable to the trustee. GE Inv. Private Placement v. Parker, 247 F.3d 543, 548 (4th Cir. 2001) ("On a Rule 12(b)(6) motion to dismiss, a court must accept the factual allegations of the complaint as true and must view the complaint in the light most favorable to the plaintiff." (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)).

[2]The relationship between the debtor, Mr. Winslow and Winslow Farms was so close that many identified them as one entity. Despite this tripartite relationship, this court refused to consolidate the Winslows' individual case with the debtor's case on February 18, 2011. See In re Tanglewood Farms, Inc. of Elizabeth City, No. 10–06719, 2011 WL 672060, at *1–2 (Bankr. E.D.N.C. Feb. 18, 2011). Mr. Winslow was also the president and majority shareholder of the Belvidere Farmers Exchange.

crop financing for the 2008, 2009 and 2010 crop years. The first promissory note, executed on February 2, 2007, had a maximum principal balance of $575,000.00, with interest accruing at 12% per annum ("first promissory note"). The second was executed on February 18, 2009, in the original principal amount of $1,920,144.15, with interest accruing at the prime rate plus 4.75% ("second promissory note"). The first and second promissory notes were subsequently modified by an agreement dated October 30, 2009 ("modification agreement"). It amended both promissory notes to reflect the change in the corporate identity of the debtor from "Tanglewood Farms, Inc." to "Tanglewood Farms, Inc. of Elizabeth City," increased the maximum principal balance under the first promissory note to $5,000,000.00, and extended the deadline upon which the balance and accrued interest were due under the second promissory note to March 31, 2010. On April 29, 2010, the parties executed a third promissory note in the original principal amount of $3,500,000.00, with interest accruing at the prime rate plus 4.75% ("third promissory note") (collectively "promissory notes").[3]

To secure repayment and performance of the obligations under the promissory notes, multiple security agreements, financing statements and deeds of trust (collectively "security instruments") were executed in favor of the defendant by Mr. Winslow, both individually and as the president of the debtor, and Mrs. Winslow. The promissory notes were secured by two deeds of trust executed on October 30, 2009 and May 5, 2010, as well as security agreements, executed on

---

[3]The defendant filed three proofs of claim corresponding to the amounts owed under the three promissory notes on August 27, 2010, which were later amended on September 8, 2010. Claim No. 1, based on the first promissory note, was in the amount of $4,083,588.69. Claim No. 2 based on the second promissory note, claimed an amount of $1,556,593.14 and Claim No. 3 was based on the third promissory note in the amount of $2,208,284.33. Therefore, the total outstanding debt owed to the defendant, based on its proofs of claim, was approximately $7,848,609.00.

February 2, 2007 and March 1, 2010, conveying a security interest to the defendant in the following property and all proceeds thereof:

> (A) Purchase Money Security Interest in crops; whether grown, growing or to be grown; located on any property owned, leased or rented by [the] debtor [and the Winslows] in Pasquotank County, NC, Perquimans County, NC and Carteret County, NC . . . . including but not limited to approximately 6,514 acres of corn, more or less. Collateral includes crop insurance proceeds. Collateral includes proceeds of any kind or description.

> (B) All of [the] Debtor's [and the Winslows'] farm machinery and equipment whether now owned or hereafter acquired . . . . Collateral includes proceeds.

The parties executed a third security agreement in favor of the defendant on April 29, 2010, which secured "all past, present and future liabilities and obligations" of the debtor and the Winslows. The defendant perfected its security interests under all of the security agreements by filing financing statements with the North Carolina Secretary of State on March 1, 2010[4] and May 6, 2010. The financing statement filed on May 6, 2010, perfected the defendant's security interest in, inter alia, the farm products, inventory and accounts of the debtor and the Winslows.

On October 30, 2009, a deed of trust was executed in favor of the defendant and encumbered approximately fifteen parcels of real property located in Pasquotank County, North Carolina and one parcel of real property located in Perquimans County, North Carolina, which were collectively referred to as the "MetLife tracts." Included in the fifteen parcels in Pasquotank County encumbered by the first deed of trust was the debtor's granary facility. The second deed of trust, dated April 29, 2010 and executed by the debtor and the Winslows on May 5, 2010, granted the defendant a security interest in twenty–two parcels of real property located in Pasquotank County,

---

[4]This financing statement was subsequently amended on March 17, 2010, to incorporate the security interests granted to the defendant under the security agreement executed on March 1, 2010.

North Carolina and commonly referred to by the parties as the "AgCarolina tracts."[5]

The funds provided under these promissory notes were, according to the trustee, used almost exclusively by Mr. Winslow to support and fund the operations of Winslow Farms. One of the defendant's employees, Ken Miller ("Miller"), was substantially involved in the operation of Winslow Farms. Miller remained onsite daily between January and May, managing Winslow Farms' liming and fertilizer operations.

Between September 30, 2008 and August 10, 2010, the defendant received payments on account of the obligations under the promissory notes totaling approximately $5,590,946.02, $3,455,000.00 of which was paid by CNH Capital America LLC ("CNH Capital"). Of the remaining balance, $2,135,946.02, only $48,496.38 was paid by the debtor and its customers by third–party checks listing the defendant as a co–payee.[6] Between 2009 and 2010, the outstanding balance under the promissory notes increased approximately $3,500,000.00, from $5,000,000.00 in 2009 to $8,500,000.00 in 2010. This substantial increase in the outstanding balance was the result of hardships suffered by Winslow Farms due to unfavorable weather conditions in 2008 and 2009.

On August 26, 2010, the debtor filed a motion for private sale and motion seeking an order to sell certain parcels of real and personal property free and clear of liens. After learning of several potential purchasers for the debtor's granary facility, a motion to approve bidding procedures was filed on September 1, 2010, which was resolved by a consent order entered on September 9, 2010, that established the method by which the purchaser would be determined. A public sale of the

---

[5]The second deed of trust granted the defendant a second lien on the fifteen parcels that were encumbered by the first deed of trust.

[6]The remaining payments were received from Mr. Winslow ($1,315,624.83) and unknown sources ($771,824.81).

debtor's granary facility and related property was held on September 15, 2010 and the high bidder, Perdue AgriBusiness Incorporated ("Perdue"), offered to purchase the granary facility for $4,200,000.00. On September 16, 2010, the debtor and the Winslows filed a joint motion for distribution of the sales proceeds and this court approved Purdue's proposed purchase price as the highest bid by order entered on September 17, 2010. The order approving Perdue as the highest bidder established a forty–eight hour deadline for any party–in–interest to object to the motion for distribution. No objections were filed prior to the deadline.

On September 28, 2010, this court entered an order allowing the motion for distribution of the proceeds from the sale of the granary facility, $4,200,000.00, as follows (hereinafter "distribution order"):

a.   First to pay closing costs, such as revenue stamps, estimated at approximately $8,000.00.

b.   Next to pay all costs of sale as may be approved by the Court, including any quarterly fees owed. It is estimated that based on . . . the proposed distributions that [the debtor] will owe quarterly fees of approximately $10,400.00, and the Winslows will owe $9,750.00, although the exact amounts to be paid will be based upon the actual distributions from the closing statements. In addition, [the debtor] has incurred estimated costs and expenses pursuant to Section 506(c) in the amount of $20,000.00 and [the] Winslow[s] ha[ve] incurred costs and expenses pursuant to Section 506(c) in the amount of $20,000.00, related [to] this sale. Amounts subject to Court approval shall be held in escrow by the Debtors' attorney until such time as the Court has approved such costs of sale. Amounts not approved by the Court shall be distributed to Meherrin Agricultural & Chemical Company (hereafter "Meherrin"), or as otherwise ordered by the Court.

c.   Next to pay the ad valorem property taxes. It is estimated that [the debtor] and the Winslows owe collectively approximately $28,000.00. The exact amounts to be paid will be based upon the actual distributions from the closing statements.

d.   Next to pay the amounts necessary to exercise the options to purchase the leased property and satisfy such lease claims, as follows:

      i.       BB&T Equipment Finance – $15,467.12

      ii.     Regions Bank – $385,000.00

      iii.   First South Leasing, LLC – $846,324.64

[e].     After these disbursements are made, there will be proceeds of approximately $2,857,058.24 available to distribute to creditors with liens on the remaining real and personal property.

[f].     [The debtor] will distribute approximately $454,507.30 to First Citizens Bank in order to satisfy its lien on the real property, such amount to be determined based on the actual date of the closing.

[g].    The Winslows will then distribute to AgCarolina Financial ACA the sum of $100,000.00, *with the balance, estimated at $2,302,550.94[7] to be distributed to Meherrin, to be applied towards its outstanding obligations and liens on the real and personal property to be sold that are owed by the Winslows and [the debtor].*

(emphasis added). Therefore, the debtor sought and this court specifically authorized a distribution of $2,289,121.17 to the defendant from the remaining proceeds of the sale to Perdue.

The debtor's plan of liquidation, filed on November 22, 2010, proposed to pay the defendant's claims in full from the sale of real property, personal property and crops. The debtor filed a notice of proposed public sale and a motion to sell personal property, mostly farm equipment, free and clear of liens on December 22, 2010, which was allowed on January 21, 2011. On February 3, 2011, the farm equipment was sold at a public auction, generating gross proceeds of $704,175.00. A portion of these proceeds, $204,291.00, was distributed to the defendant by order entered on April 28, 2011. The debtor filed its first amended plan of reorganization, restating the defendant's claims as an oversecured creditor and proposing to fully satisfy its claims from proceeds received from the

---

[7]After adjustments were made to senior distributions, the defendant received a distribution of $2,289,121.17 from the proceeds of the sale.

sale of real estate, personal property and crops.  The defendant filed an objection to confirmation

of the debtor's first amended plan of reorganization on March 14, 2011.  The defendant also filed

an objection to confirmation of the Winslow's first amended plan of reorganization, which was filed

contemporaneously with the debtor's first amended plan of reorganization.  The Winslows' second

amended plan of reorganization, filed on August 9, 2011, classified the defendant in Class 4 and

indicated that its claims were satisfied in full postpetition and the defendant would not receive

further payments.  Despite having liens on real property, equipment and crops owned by the

Winslows, the defendant withdrew its proofs of claim in the Winslows' individual case and did not

object to their second amended plan of reorganization.  As a result, the Winslows' second amended

plan was confirmed by order entered on November 11, 2011, which authorized them to pay their

remaining creditors and allowed claims through liquidation of real property, remaining equipment

and crops owned by the Winslows.  The defendant, however, has not received any distributions from

their sale of real property, equipment and crops, despite having blanket liens on all the Winslows'

real and personal property.

         After receiving the authorized distributions pursuant to the distribution order and a portion

of the proceeds realized from the farm equipment auction, the defendant withdrew its proofs of claim

on August 31, 2011, indicating that they had been paid in full.[8]  Because the defendant's claims were

---

        [8]On April 28, 2011, this court also entered an order authorizing the distribution of
approximately $1,809,548.79 to the defendant from the proceeds of the court–approved sale of
numerous tracts of real property owned by the Winslows for $17,000,000.00.  The defendant's
distribution, however, was offset by the actual amount it received through the distribution of
certain proceeds resulting from the sale of equipment and a per diem interest of $374.61 to the
date of closing.  The remaining balance of the debt owed to the defendant was satisfied from the
proceed from the sale of crops in February 2011 and March 2011.  See In re Winslow, No.
10–06745, 2011 WL 5902619, at * 1 (Bankr. E.D.N.C. June 22, 2011).

paid in full, it also withdrew its objection to the debtor's amended plan of reorganization on September 29, 2011.

The trustee filed a complaint initiating this adversary proceeding on August 19, 2012, against the defendant and CNH Capital seeking avoidance and recovery of preferential, fraudulent and unauthorized postpetition transfers pursuant to §§ 544, 547–551 of the Bankruptcy Code and N.C. Gen. Stat. § 39–23.1 et seq. The defendant filed the motion to dismiss and supporting memorandum of law currently before the court on October 16, 2012. After receiving several extensions of time in which to respond, the trustee filed a response and memorandum in opposition to the defendant's motion to dismiss on January 9, 2013. On January 21, 2013, the defendant filed a reply in support of its motion to dismiss regarding the issues of estoppel and waiver.

## STANDARD OF REVIEW

Every pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2); Fed. R. Bankr. P. 7008. A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal and factual sufficiency of the complaint. Jones v. McNutt Serv. Grp., Inc., No: 5:10–CV–84, 2010 WL 3733027, at *1 (E.D.N.C. July 23, 2010) ("In analyzing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for 'failure to state a claim upon which relief can be granted,' a court must determine whether the complaint is legally and factually sufficient." (citations omitted)). To demonstrate entitlement to relief and survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Angell v. Ber Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 745 (Bankr. E.D.N.C. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (emphasizing that a pleading providing "labels and conclusions, and a formulaic recitation of the

9

elements of a cause of action will not do."(citation omitted))).  There are two working principles

upon which the heightened pleading standard announced in Twombly and Ashcroft v. Iqbal, 556

U.S. 662 (2009) is based:

> First, the tenet that the court must accept as true all of the allegations contained in
> a complaint is inapplicable to legal conclusions.  Threadbare recitals of the
> elements of a cause of action, supported by mere conclusory statements, do not
> suffice . . . .  Second, only a complaint that states a plausible claim for relief
> survives a motion to dismiss.

Ber Care, 409 B.R. at 747 (quoting Iqbal, 556 U.S. at 677). "[W]here the well–pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 678-79

("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged.  The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility

of entitlement to relief.'" (internal citations and brackets omitted)).

    Fed. R. Bankr. P. 9(b), made applicable to proceedings in bankruptcy by Fed. R. Bankr. P.

7009, requires parties alleging fraud to "state with particularity the circumstances constituting fraud

. . . ." Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009.  Claims for avoidance of actual fraudulent

transfers must satisfy the particularity requirement imposed by Fed. R. Civ. P. 9(b). In re Derivium

Capital, LLC, 380 B.R. 429, 439 (Bankr. D.S.C. 2006) (citation omitted).

## DISCUSSION

    In its  motion to dismiss currently before the court, the defendant asserts alternative grounds

for dismissal of this adversary proceeding.  First, it contends that all of the counts in the trustee's complaint are barred by the equitable doctrines of estoppel and waiver because the trustee is bound by the prior actions of the debtor–in–possession, upon which the defendant relied.  Alternatively and pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7012, the trustee's complaint fails to state a claims to avoid and recover alleged fraudulent, preferential and unauthorized postpetition transfers upon which relief may be granted and, therefore, must be dismissed.  Additionally, Count IV, a portion of which is based on a theory of actual fraud, should be dismissed for failing to plead with the particularity required under Fed. R. Civ. P.  9(b) and Fed. R. Bankr. P. 7009.

### I. Estoppel and Waiver

Initially, the defendant contends that every count alleged in the complaint is barred by the doctrines of estoppel and waiver because the trustee, as successor to the debtor–in–possession, is estopped from taking a position that is inconsistent with his predecessor's authorized actions. Additionally, the defendant asserts each claim advanced by the trustee was previously waived by the representations and actions of his predecessor, upon which the defendant relied.

Equitable doctrines "serve[ ] to moderate the unjust results that would follow from the unbending application of common law rules and statutes."  Brooks v. Hackney, 329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991).  "Estoppel is not a single coherent doctrine, but a complex body of interrelated rules, including estoppel by record, estoppel by deed, collateral estoppel, equitable estoppel, promissory estoppel, and judicial estoppel."  Whitacre P'ship v. Biosignia, Inc., 358 N.C.

1, 13, 17, 591 S.E.2d 870, 879, 881 (2004) (internal quotation marks and citation omitted)).[9] Estoppel "precludes a person from denying or asserting anything to the contrary of that which has, in contemplation of law, been established as the truth." Id. at 13, 591 S.E.2d at 879 (emphasizing that the subsequent inconsistent position of the party, not its original conduct "operates to the injury of the other party." (citation omitted)).

Equitable estoppel is defined as "the effect of the voluntary conduct of a party whereby he is absolutely precluded . . . from asserting rights which might perhaps have otherwise exercised . . . as against another person who in good faith relied upon such conduct." Gore v. Myrtle/Mueller, 362 N.C. 27, 33, 653 S.E.2d 400, 405 (2007) (stating that equitable estoppel "arises when one party, by his acts, representations, or silence when he should speak, intentionally, or through culpable negligence, induces a person to believe certain facts exist, and that person reasonably relies on and acts on those beliefs to his detriment."(citation omitted)). "Equitable estoppel prevents one party from taking inconsistent positions in the same or different judicial proceedings, and 'is an equitable doctrine designed to protect the integrity of the courts and the judicial process.'" Id. (quoting State v. Taylor, 128 N.C. App. 394, 400, 496 S.E.2d 811, 815, aff'd per curiam, 349 N.C. 219, 504 S.E.2d

---

[9]In addition to equitable estoppel, quasi–estoppel and judicial estoppel, the North Carolina Supreme Court has prevented litigants from asserting inconsistent positions in the same or subsequent judicial proceeding without citing any supporting legal theory. See, e.g., King v. Snyder, 269 N.C. 148, 153, 152 S.E.2d 92, 96 (1967) ("A person appointed administrator and acting in that capacity in defending a wrongful death action is estopped from asserting therein the invalidity of his own asserted status as such administrator."); Kanupp v. Land, 248 N.C. 203, 206–07, 102 S.E.2d 779, 782 (1958) (emphasizing that "plaintiffs cannot ask for the location of something which they deny exists[.]"). As observed in Rand v. Gillette, 199 N.C. 462, 463, 154 S.E.2d 746, 747 (1930), "[a] party is not permitted take a position in a subsequent judicial proceeding which conflicts with a position taken by him in a former judicial proceeding, where the latter position disadvantages his adversary . . . ." In Rand, the court recognized that parties "cannot safely 'run with the hare and hunt with the hound.'" Id.

785 (1998)).

> [T]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

Hawkins v. M & J Fin. Corp., 238 N.C. 174, 177–178, 77 S.E.2d 669, 672 (1953) (citations omitted). To prevail under a theory of equitable estoppel, the movant must establish all of the elements as related to the party estopped as well as those required for invocation of the doctrine. Am. Constructors of N.C., Inc. v. SAK Dev., Inc. (In re SAK Dev., Inc.), No. 08–00050, 2010 WL 2228247, at *5 (Bankr. E.D.N.C. June 2, 2010). North Carolina also recognizes a branch of equitable estoppel, commonly referred to as "quasi–estoppel" or "estoppel by benefit," Brooks, 329 N.C. at 172 n.3, 173, 404 S.E.2d at 858 n. 3, 859 (1991), where "a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction." Whitacre P'ship, 358 N.C. at 18, 591 S.E.2d at 881–82 (citations omitted). Quasi–estoppel differs from equitable estoppel in that the latter may only be applied where the party invoking the doctrine detrimentally relied on the representation or actions of the opposing party. Id. at 18, 591 S.E.2d at 881–82 (emphasizing for purposes of comparison that quasi–estoppel only requires a showing that it would be unconscionable to permit a party to assert contrary positions)

Judicial estoppel, first adopted by North Carolina in Whitacre P'ship, is "an equitable

doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding."  King v. Herbert J. Thomas Mem'l Hosp., 159 F.3d 192, 196 (4th Cir. 1998) (citations omitted); see, e.g., Powell v. City of Newton, 364 N.C. 562, 569, 703 S.E.2d 723, 728 (2010), reh'g denied 365 N.C. 90, 706 S.E.2d 241 (2011).  Judicial estoppel is a "discretionary tool" courts use primarily "to protect the integrity of the courts and the judicial process[,]" Whitacre P'ship, 358 N.C. at 28–29, 591 S.E.2d at 888–89, by preventing parties from "playing fast and loose with the courts [by] blowing hot and cold as the occasion demands." King, 159 F.3d at 196 (citing Lowery v. Stovall, 92 F.3d 219, 223, 225 (4th Cir. 1996)); DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 191–92 (7th Cir. 1995)  ("[C]ourts are under no compulsion to heed the shifting theories of 'chameleonic litigants' ").  The Fourth Circuit has recognized that the following three elements, at a minimum, must be present to trigger application of judicial estoppel:

> (1) The party to be estopped is asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage.

King, 159 F.3d at 196–97 (emphasizing that "judicial estoppel will not be applied where the party's inconsistent positions resulted from inadvertence or mistake." (citations omitted)); Whitacre P'ship, 358 N.C. at 26–27, 591 S.E.2d at 887 (stating that "there is no need for judicial estoppel where previously established doctrines would preclude the assertion of an inconsistent position." (citation omitted)).[10]

---

[10]According to the North Carolina Supreme Court, three frequently considered elements of judicial estoppel are whether:

Under the doctrine of waiver, a party may also be estopped from asserting a position, right or advantage, which it previously waived.  Danville Lumber & Mfg. Co. v. Gallivan Building Co., 177 N.C. 103, 107, 97 S.E. 718, 719 (1919) ("Waiver must be manifested in some unequivocal manner, and . . . it must in all cases be designed, or one party must have so acted as to induce the other to believe that he intended to waive, when he will be forbidden to assert the contrary.").  A party may be estopped from claiming a right, benefit or advantage where a manifestation of an intention to waive is "expressed or implied from acts or conduct that naturally lead the other party to believe that the right has been intentionally given up."  Klein v. Avemco Ins. Co., 289 N.C. 63, 68, 220 S.E.2d 595, 599 (1975); see McNally v. Allstate Ins. Co., 142 N.C. App. 680, 683, 544 S.E.2d 807, 809–10 (2001) (holding that a "party may waive a contractual right by any intentional and voluntary relinquishment."(citation omitted)).  Although waiver may, in certain instances, have "the characteristics of estoppel . . . it is always based upon an express or implied agreement." Klein,

_____

(1) the party's subsequent position is clearly inconsistent with its earlier position, (2) judicial acceptance of a party's position might threaten judicial integrity because a court has previously accepted that party's earlier inconsistent position, and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party as a result[.]

Powell, 364 N.C. at 569, 703 S.E.2d at 728–29 (internal quotation marks and citations omitted).  The first factor, a subsequent position clearly inconsistent with its earlier position, is the only factor necessary to trigger application of judicial estoppel. Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 188, 594 S.E.2d 809, 812 (2004).

Judicial estoppel differs from companions, equitable estoppel and quasi–estoppel, in several respects.  "First, judicial estoppel seeks to protect courts, not litigants, from individuals who would play 'fast and loose' with the judicial system."  Whitacre P'ship, 358 N.C. at 26, 591 S.E.2d at 887 (limiting "application of judicial estoppel relative to those doctrines that may be applied when litigants, not courts, are threatened by a party's shift in position.").  Second, due to "its inherent flexibility as a discretionary equitable doctrine, judicial estoppel plays an important role as a gap–filler, providing courts with a means to protect the integrity of judicial proceedings where doctrines designed to protect litigants might not adequately serve that role." Id.

15

289 N.C. at 68, 220 S.E.2d at 599.  The elements of a valid wavier under North Carolina law are "(1) the existence, at the time of the alleged waiver, of a right, advantage or benefit; (2) the knowledge, actual or constructive, of the existence thereof; and (3) an intention to relinquish such right, advantage or benefit." Fetner v. Granite Works, 251 N.C. 296, 302, 111 S.E.2d 324, 328 (1959) (citation omitted).

Application of these equitable doctrines to bankruptcy proceedings requires an examination of the relationship between the debtor, the debtor–in–possession and a subsequently–appointed chapter 7 trustee.  "A debtor–in–possession is a debtor, who during the pendency of the case prior to confirmation of the reorganization plan, retains the bankruptcy estate's property in the fiduciary capacity of a trustee." Peters v. Pikes Peak Musicians Ass'n, 462 F.3d 1265, 1271 n. 3 (10th Cir. 2006) (internal quotation and citations omitted).  Section 1107(a) of the Bankruptcy Code grants the debtor–in–possession the powers of a chapter 11 trustee, including "the authority to bring – and waive the right to bring avoidance actions." Terlecky v. Peoples Bank, N.A. (In re Amerigraph, LLC), 456 B.R. 349, 356 (Bankr. S.D. Ohio 2011) (citations omitted); see, e.g., 11 U.S.C. § 1107(a); Hill v. Akamai Techs., Inc. (In re MS55, Inc.), 477 F.3d 1131, 1134–35 (10th Cir. 2007) (recognizing that it is "well established that a Chapter 7 trustee succeeds to the rights of the debtor–in–possession and is bound by prior actions of the debtor–in–possession to the extent approved by the court."); Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.), 503 F.3d 933, 944 (9th Cir. 2007) (suggesting that "a trustee may challenge a debtor–in–possession's action in extraordinary circumstances, such as where a debtor–in–possession acted outside the confines of the bankruptcy laws." (citation omitted)); Armstrong v. Norwest Bank, Minneapolis, N.A., 964 F.2d 797, 801 (8th Cir. 1992) (holding that the debtor–in–possession's agreement to a

16

stalking–horse bid binds a subsequently–appointed chapter 7 trustee); Jonas v. U.S. Small Bus. Admin. (In re Southland Supply, Inc.), 657 F.2d 1076, 1080 (9th Cir. 1981) (holding that a subsequently–appointed trustee could not contest a lien on lawsuit proceeds that was previously granted by the debtor–in–possession and authorized by the court). Courts evaluating this successive relationship have recognized that:

> To hold that . . . [the actions of the debtor–in–possession are] not binding on the estate after the appointment of a trustee would greatly impair the ability of the debtor in possession to conduct its business because it would discourage third parties from dealing with the debtor in possession for fear that the court would later appoint a trustee and declare that the actions [previously] taken by the debtor–in–possession are invalid and not binding on the trustee.

In re Philadelphia Athletic Club, Inc., 17 B.R. 345, 347 (Bankr. E.D. Penn. 1982) (indicating that [s]uch a result [wa]s inconsistent with the purpose of chapter 11 of the [Bankruptcy] Code to allow the debtor in possession to conduct its business and formulate a successful plan of reorganization . . . ."); Armstrong, 964 F.2d at 801 ("Creditors must be able to deal freely with debtors–in–possession, within the confines of the bankruptcy laws, without fear of retribution or reversal at the hands of a later appointed trustee."); Off. Comm. of Unsecured Creditors v. Belgravia Paper Co. (In re Great N. Paper, Inc.), 299 B.R. 1, 7 (D. Maine 2003) ("Entities will not deal with debtors–in–possession if their agreements are not binding."); Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.), 67 B.R. 899, 901–02 (Bankr. E.D. Tenn. 1986) (emphasizing that "[t]he debtor–in–possession not only has the power to avoid liens and other transfers, but also the duty to exercise that power for the benefit of all creditors."). Moreover, the legislative history to § 1107(a) indicates that "section [1107] places a debtor in possession in the shoes of a trustee in every way . . . .giv[ing] the [debtor] rights and powers of a chapter 11 trustee . . . except the investigative duties[.]" S. Rep. No. 95–989, 95th Cong., 2d Sess. 116 (1978).

17

In Steele v. Accountants Professional Staff Inc. (In re Superior Toy & Manufacturing Co.), the United States District Court for the Northern District of Illinois addressed whether a chapter 7 trustee is bound by the actions of its predecessor, the debtor–in–possession. No. 94–C–3181, 1995 WL 276024 (N.D. Ill. May 9, 1995), aff'd 78 F.3d 1169 (7th Cir. 1996). After an chapter 11 involuntary petition forced the debtor into bankruptcy, the bankruptcy court authorized the debtor–in–possession to assume a license agreement between the debtor and Playtex Family Products Corp. ("Playtex").[11] A trustee was subsequently appointed after the debtor converted its case to chapter 7; thereafter, the chapter 7 trustee filed an adversary proceeding against Playtex seeking avoidance and recovery of payments the debtor made pursuant to the license agreement with Playtex. Playtex filed a motion to dismiss the adversary proceeding, which was allowed by the bankruptcy court.[12] On appeal, the district court affirmed and observed the following in regards to the relationship between a debtor–in–possession and its successor:

> The debtor–in–possession acts as the trustee of the debtor unless a chapter 11 trustee is appointed. 11 U.S.C. § 1107. As such, the debtor–in–possession is the predecessor

---

[11]The debtor was required to cure all defaults under the license agreements at the time it was assumed, consisting of $6,565.00 in outstanding payments. 1995 WL 276024, at *1. The trustee's theory of avoidance in Superior Toy was based on the debtor's failure to disclose the $46,000.00 payment the debtor made to Playtex in its motion to assume the license agreement. Id. at *1, 8.

[12]In allowing Playtex's motion to dismiss, the bankruptcy court "held that the Trustee was bound to honor the decision of its predecessor, the debtor-in-possession, to assume the License Agreement and cure all defaults under that agreement." 1995 WL 276024, at *8 (summarizing the bankruptcy court's decision). The bankruptcy court further reasoned "that continuity on the part of the Debtor-in-Possession and the Trustee was necessary to avoid chaos in the bankruptcy proceeding." Id. (indicating that "it would be manifestly unfair to allow the Trustee to take a position regarding the license agreement that is wholly inconsistent with previous actions (three years earlier) pertaining to the same license agreement taken by a party in her position." (quoting Steege v. Accountants Prof'l Staff Inc. (In re Superior Toy Mfg. Co.), No. 93–A–10350, 1994 WL 811537, at *2 (Bankr. N.D. Ill. Apr. 6, 1994 (citation omitted)).

18

in interest of a chapter 7 trustee appointed upon conversion of a bankruptcy proceeding from a reorganization to a liquidation. Paul v. Monts, 906 F.2d 1468, 1473 (10th Cir. 1990) (holding that the trustee is bound by the authorized actions of the debtor–in–possession).  A chapter 7 trustee should therefore be bound by the prior acts of a debtor-in-possession.  Any other result would be unfair to creditors, such as Playtex, who relied on the acts of the debtor–in–possession.  The Eighth Circuit addressed this problem in Armstrong v. Norwest Bank, Minneapolis, N.A., 964 F.2d 797 (8th Cir. 1992), stating:

> We cannot entertain any suggestion to the contrary, as the result would be chaos among debtors-in-possession and their creditors. Creditors must be able to deal freely with debtors–in–possession, within the confines of the bankruptcy laws, without fear of retribution or reversal at the hands of a later appointed trustee.

Id. at 801; see also In re Sherwood Ford, Inc., 125 B.R. 957, 961 (Bankr. D. Md. 1991), aff'd, 1992 WL 295951 (D. Md. Sep[t]. 17, 1992); In re Tandem Group, Inc., 61 B.R. 738, 741 (Bankr. C.D. Cal. 1986).

Id. at *8.  These observations compelled the conclusion "that the trustee, as a successor in interest to the debtor–in–possession, is bound by the acts of the debtor–in–possession."  Id. at *8–9 (agreeing with the bankruptcy court "that the Trustee is bound by the Debtor's Assumption Order to provide full payment of the amounts due under the License Agreement.  Accordingly, no preference action may stand.").  In reaching this conclusion, the court rejected the argument by the trustee that she is not bound by the assumption of the license agreement because it did not contain an express provision providing that the agreement is binding on a subsequently appointed trustee. Id. at *9.

The conclusion reached by the court in Superior Toy & Manufacturing Co., is further supported by other courts that have barred chapter 7 trustees from asserting a course of conduct or actions that are inconsistent with those taken by the debtor–in–possession.  See, e.g., MS55, 477 F.3d at 1135; Int'l Fibercom, 503 F.3d at 944; Armstrong, 964 F.2d at 801; Great N. Paper, 299 B.R. at 7; Amerigraph, 456 B.R. at 356; Pollack v. FDIC (In re Monument Record Corp.), 71 B.R. 853,

19

862 (Bankr. M.D. Tenn. 1987) (emphasizing that "courts recognize that the acts of the debtor–in–possession generally bind a subsequently-appointed trustee."); Begier v. Am. Express (In re Am. Int'l Airways, Inc.), 74 B.R. 691 (Bankr. E.D. Pa. 1987) (stating the general principle that a chapter 7 trustee is bound by the actions of the debtor–in–possession); Chattanooga Wholesale Antiques, 67 B.R. at 902.

Irrespective of the validity of the all counts alleged in the complaint, the trustee's commencement of this adversary proceeding is barred by several versions of estoppel and waiver because he, stepping into the shoes of the debtor–in–possession, cannot attack or take a position inconsistent with those actions previously taken by the debtor–in–possession. See, e.g., Paul, 906 F.2d at 1473 ("When asserting rights of action against another, the bankruptcy trustee has no greater rights than the debtor has." (citation omitted); Great N. Paper, 299 B.R. at 7 ("The effect of allowing such an attack would . . . have a chilling effect on the ability of debtors–in–possession to proceed in normal–course arrangements and compromises in Chapter 11 cases." (internal quotation marks and citation omitted)).  The court finds that the trustee's claims seeking avoidance and recovery of fraudulent and preferential transfers in Counts I, II, III and IV of the complaint, are barred by equitable estoppel, quasi–estoppel and waiver.  Therefore, Counts I, II, III and IV of the complaint are dismissed.  Count V of the complaint is barred by judicial estoppel and, therefore, is dismissed.

In its capacity as the debtor–in–possession, the debtor had the authority to investigate, pursue and commence the avoidance actions that are the subject of this adversary proceeding.  Prior to conversion, the debtor exercised its duties as the debtor–in–possession, which included determining whether to object to the defendant's proofs of claim or pursue actions to avoid, as either fraudulent or preferential transfers, the obligations incurred or payments made to the defendant.  After

weighing these options, it elected not to pursue avoidance actions or otherwise challenge the promissory notes and security instruments supporting the defendant's claims.  Cf. Chattanooga Wholesale Antinques, 67 B.R. at 901–02 (recognizing that although it "has the power to avoid liens and other transfers . . . . [t]his does not mean that the debtor–in–possession must attempt to avoid every lien or other transfer that might be avoidable.").  This forbearance by the debtor–in–possession reaped benefits for the debtor.  The defendant relied on the debtor–in–possession's actions when it withdrew its pending motions for relief from the automatic stay and objection to the debtor's amended plan of reorganization in exchange for full satisfaction of its claims.  Following the distribution order, the defendant also withdrew its proofs of claim in the debtor's case.  By cooperating with the defendant and electing not to pursue avoidance of the promissory notes, security instruments or payments, the debtor "bought peace" and reduced opposition to its reorganization efforts.  See Amerigraph, 456 B.R. at 357; Chattanooga Wholesale Antiques, 67 B.R. at 902.  This decision to waive any effort to seek avoidance of the obligations incurred and payments made to the defendant pursuant to the promissory notes and security instruments, precludes the trustee from subsequently seeking to challenge or avoid them as fraudulent and preferential transfers.  See, e.g., Robb–Fulton v. Robb (In re Robb), 23 F.3d 895, 899 (4th Cir. 1994) (applying quasi–estoppel to preclude a debtor, who previously deducted alimony payments on his income tax returns, "from avoiding the corresponding obligations or effects of this classification under the Bankruptcy Code."); In re Zeitchik, 369 B.R. 900, 905 (Bankr. E.D.N.C. 2007) ("A party who has failed to report payments pursuant to a divorce decree as alimony income on income tax returns should likewise be estopped from alleging that the payments are alimony for purposes of 11 U.S.C. § 523(a)(5).").

21

To allow the trustee to assert that these promissory notes, security instruments and payments to the defendant, the validity of which were previously acknowledged by the debtor–in–possession and satisfied in part from a distribution authorized by this court, were fraudulent and preferential runs counter to these principles. Furthermore, the debtor–in–possession's ability to conduct business would be impaired by instilling fear into creditors that actions, agreements and representations made by a debtor–in–possession are not binding and could be reversed by a subsequently–appointed trustee. MS55, 477 F.3d at 1134–35; Armstrong, 964 F.2d at 801; Superior Toy, 1995 WL 276024, at *8. It would be manifestly unfair to allow the trustee to pursue a course of action to the detriment of the defendant, which the debtor–in–possession previously contemplated and determined to forego. See id. Thus, equitable estoppel and quasi–estoppel preclude the trustee from asserting the fraudulent and preferential transfer claims against the defendant in Counts I, II, III and IV of the complaint.

Counts I, II, III and IV of the complaint are also barred by the doctrine of waiver because any right the trustee had to prosecute the claims in this adversary proceeding was previously waived by the debtor–in–possession. Rather than challenging validity or extent of the promissory notes, security instruments or prepetition payments made to the defendant, the debtor–in–possession made the strategic decision to reorganize through a liquidation of its assets, the proceeds of which would be paid to the defendant and other secured creditors in satisfaction of their claims. As previously mentioned, the debtor–in–possession strategically decided not to challenge any of its obligations to the defendant but instead to acknowledge them. This strategic decision coupled with the debtor–in–possession's intent to satisfy the defendant's claims in full is sufficient to manifest an intention leading the defendant to believe the promissory notes, security instruments and payments

22

received from the debtor would not be challenged as fraudulent or preferential.[13]  Because the trustee

has no rights greater than the debtor–in–possession, any right to commence this adversary

proceeding was waived and, therefore, the trustee was not entitled to bring these avoidance actions.

Armstrong, 964 F.2d at 801; Paul, 906 F.2d at 1473.  Therefore, the causes of action in Counts I, II,

III and IV, all of which were within the debtor's statutory authority to commence  as the

debtor–in–possession, are dismissed pursuant to the doctrine of waiver.

Furthermore, the trustee is judicially estopped from asserting a claim for avoidance and

recovery of the court–authorized distribution to the defendant as an unauthorized postpetition

transfer and, therefore, Count V of the complaint is dismissed.  Application of judicial estoppel is

warranted under these circumstances because if not allowed, the trustee would gain an unfair

advantage by taking a position, with respect to the distribution made to the defendant, that is

factually incompatible with the prior representations and actions of the debtor–in–possession.  The

position taken by the debtor – that the defendant's security interest in the granary facility was

unavoidable, which entitled it to a distribution from the proceeds realized by the sale – is factually

incompatible with the trustee's current claim that the distribution is avoidable because the court was

unaware of the security interest's avoidability at the time it authorized the distribution.  King, 159

F.3d at 196–98 (emphasizing that a single failure to correct an inaccurate factual disclosure, which

was not based upon a mistake or inadvertence, is sufficient to create an inconsistency when a

---

[13]The essential element of waiver,  the intention to relinquish a right, advantage or
benefit, is demonstrated in the instant case by the debtor–in–possession's representations and
course of conduct indicating that it was not going to challenge or avoid the promissory notes and
security instruments that form the basis of the defendant's proofs of claim.  The
debtor–in–possession's intent to waive its further evidenced by its full satisfaction of the
defendant's claims, which led the defendant to believe that the obligations, security interests and
payments would not be later challenged as fraudulent or preferential transfers.

contrary position is advanced and "would undermine the integrity of the judicial process."). This court acknowledged and accepted the debtor–in–possession's position regarding the defendant's security interests in the debtor's granary facility in the distribution order. The distribution order authorized a substantial portion of the proceeds realized from the sale of the debtor's granary (approximately $2,289,121.17) be paid to the defendant "to be applied towards its outstanding obligations and liens on the real and personal property to be sold that are owed by the Winslows and [the debtor]." The inconsistent position advanced by the trustee in the instant case, if allowed, would "make a mockery out of the court[]," and "put in jeopardy the full faith and credit afforded to earlier decisions." Anderson v. Dobson, No. 1:06–CV–2, 2007 WL 2462675, at *22 (W.D.N.C. Mar. 22, 2007), adopted in part by 627 F. Supp. 2d 619 (W.D.N.C. 2007).[14]

## II. Avoidance and Recovery of Preferential Transfers

The defendant contends that Counts II and III fail to state claims upon which relief may be granted and, therefore, should be dismissed pursuant to Rule 12(b)(6) because the complaint fails to allege facts sufficient to demonstrate that the debtor insolvency on the dates of the challenged transfers or alternatively, that the defendant was a statutory or nonstatutory insider.

Section 547 of the Bankruptcy Code provides that a trustee may avoid, as preferential, any

---

[14]The trustee cannot now come forward and argue that the distribution order is ambiguous as to what portion of the proceeds were authorized to be paid to the defendant and that the distributions made to the defendant should be returned as unauthorized postpetition payments avoidable under § 549. The court, therefore, rejects the trustee's argument that the distribution order or prior explicit or implicit actions of the debtor–in–possession are only binding on a subsequently appointed chapter 7 trustee if the agreement or action undertaken expressly provides or states that it is binding. See Superior Toy, 1995 WL 276024, at *9 (rejecting the argument that the chapter 7 trustee was not bound by the debtor–in– possession's assumption of a license agreement because there was no express provision in the court's order allowing the assumption that made it binding on her).

transfer of the debtor's interest in property

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  The burden of proving each element under § 547(b) rests with the trustee. Id. § 547(g).  A complaint seeking to avoid and recover preferential transfers survives a motion to dismiss if it includes "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of the transferee and (iv) the amount of the transfer." Ber Care, 409 B.R. at 748 (citing In re Valley Media, 288 B.R. 189, 191 (Bankr. D. Del. 2008)).  In Valley Media, allegations that the defendant received preferential payments in an amount of "not less than $624,627.18" during the ninety–day preference period were not sufficient to demonstrate entitlement to relief under § 547(b). 288 B.R. at 191.

"The date on which each alleged transfer was made is critical to ascertaining whether the

transfer is subject to avoidability under § 547." Angell v. Burrell (In re Caremerica, Inc.), No. 08–00173, 2009 WL 2253225, at *3 (Bankr. E.D.N.C. July 28, 2009). A transfer is avoidable as a preference if it was made within the ninety–day period prior to the date of the filing of the petition. 11 U.S.C. § 547(b)(4)(A). However, where the transferee allegedly receiving the benefit was an "insider," the transfer is avoidable where it occurred between ninety days and one year prior to the petition date. 11 U.S.C. § 547(b)(4)(B); Burrell, 2009 WL 2253225, at *4 (emphasizing that the trustee must address whether the transferee was an insider of the debtor when alleging preferential transfers between ninety days and one year prior to the petition date).

All of the transfers alleged to be preferential in the instant case take place between ninety days and one year prior to the petition date; therefore, the critical inquiry regarding the plausibility of Counts II and III of the complaint is whether the defendant is an "insider" of the debtor.

The Bankruptcy Code draws a distinction between statutory insiders and nonstatutory insiders. Statutory insiders are those who "fit[] within the [B]ankruptcy [C]ode's definition of an insider." Lynch v. Winslow (In re Winslow), 473 B.R. 94, 97, 103 (E.D.N.C. 2012) (defining statutory insiders as "[t]hird parties having a certain, statutorily defined relationship with a debtor . . . under section 101(31)."[15] By defining an "insider" as a non–exhaustive list of entities, § 101(31)

_____

[15]Section 101(31)(B) of the Bankruptcy Code provides a nonexhaustive definition of the term "insider" and where the debtor is a corporation, an "insider" includes:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

"creates (but does not define) what is known as a "non[]statutory insider."  Id. at 101 (citations

omitted); accord Smith v. Porter (In re Carr & Porter, LLC), 416 B.R. 239, 254 (Bankr. E.D. Va.

2009) ("Because the statutory language merely 'includes' types of persons deemed to be insiders,

courts have found these categories nonexhaustive.").

A nonstatutory insider is "any person or entity whose relationship with the debtor is

sufficiently close so as to subject the relationship to careful scrutiny." Butler v. David Shaw, Inc.,

72 F.3d 437, 443 (4th Cir. 1996); Winslow, 473 B.R. at 103 those "who do not fit in the . . .

definition of insider but who are nonetheless sufficiently interested parties to fall within section

101(31).");  accord Lynch v. Joe Denning & Sons Farms (In re Joe Denning & Sons Farms), 467

B.R. 369, 372 (E.D.N.C. 2012).  The Fourth Circuit focuses on the relationship between the debtor

and the alleged insider when determining whether the latter is considered a nonstatutory insider;

however, it has seemingly endorsed two separate analyses of that relationship.  Compare Butler, 72

F.3d at 443, with In re Broumas, 135 F.3d 769, 1998 WL 77842, at *7–8 (4th Cir. Feb. 24, 1998)

(unpublished) (stating that "insider status is determined by a factual inquiry into the debtor's

relationship with the alleged insider." (citations omitted)), and Winslow, 473 B.R. at 104

(recognizing the tension caused by Bulter and Broumas in the lower courts in the Fourth Circuit

while noting, in accordance with the legislative history of § 101(31), an insider "is intended to

encompass those 'who ha[ve] a sufficiently close relationship with the debtor that [their] conduct

---

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer or person in control of the debtor.

11 U.S.C. § 101(31)(B)

is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor." (citation omitted)).[16]  In Butler, the Fourth Circuit focused on whether "the alleged insider . . . exercise[d] sufficient authority over the debtor so as to unqualifiably dictate . . . the disposition of assets." Butler, 72 F.3d at 443.  However, in an unpublished decision, the Fourth Circuit seemed to endorse a different approach that focused on the closeness of the relationship between the debtor and the alleged insider, as well as on whether the challenged transaction was made at arms length. Broumas, 1998 WL 77824, at *7–8.

Counts II and III of the trustee's complaint seek to avoid, as preferential, the security instruments the debtor executed and the payments the debtor made to the defendant on account of its obligations under the promissory notes within the one–year period prior to the petition date. Underlying both these counts is the trustee's  contention that the defendant is an insider of the debtor.  Supporting this contention, is the allegation that one of the defendant's representatives, Miller, maintained a continuous presence on the premises of the Winslow Farms between January and May throughout their financing relationship.  Additionally, the defendant's management of Winslow Farms' liming and fertilizer operations allowed it to obtain an active and substantial involvement in the operation of Winslow Farms.

---

[16]In Broumas, the Fourth Circuit relied on Butler in determining that the transferor and the transferee "had a sufficiently close relationship to subject it to scrutiny."  1998 WL 77824, at *8.  Over the parties' fifteen–year relationship they "ha[d] been creditor and debtor, principal and agent, joint venturers, attorney and client, landlord and tenant, and close friends."  The two were involved in investment schemes, extended numerous loans to one another and the debtor permitted the transferee to withdraw funds from his law firm's operating account "as if it were his own by giving him signature authority[.]" Id.  "In light of this evidence, we cannot say that the bankruptcy court's finding that [the transferee] was an insider is clearly erroneous." Id.

These allegations may support a finding that the defendant was an insider of Winslow Farms or the Winslows; however, they fail to support the plausible inference that the defendant is a statutory or nonstatutory insider of the debtor.  See, e.g., 11 U.S.C. § 101(31); Butler, 72 F.3d at 443; In re Oakwood Homes, 340 B.R. 510, 522, 524 (Bankr. D. Del. 2006).  The complaint fails to reveal any basis for the trustee's assertion that the defendant qualifies as a statutory insider or any facts demonstrating, with plausibility, that the defendant is a nonstatuory insider, such that the closeness of the its relationship with the debtor warrants careful scrutiny.  See Ber Care, 409 B.R. at 753 (concluding that the trustee's mere assertion that the defendants "'are insiders as that term is defined in § 101(31) and used in § 547(b)' is conclusory and insufficient without supporting facts.").  Absent from the complaint are any facts to support the plausible belief that the defendant is a director, officer, general partner or person controlling the debtor or a relative of any such director, officer, general partner or person in control of the debtor.

The  complaint also fails to plead, with plausibility, the existence of a direct or indirect relationship between the debtor and the defendant, let alone one that was impermissibly close to subject it to careful scrutiny.  Unlike those in Bulter and Oakwood Homes, the complaint in the instant case fails to allege any facts or details, aside from their previous financing relationship, to support an inference that the defendant was an insider of the debtor.  See Bulter, 72 F.3d at 443; Oakwood Homes, 340 B.R. at 522, 524 (concluding that a preference claim alleging that defendants were insiders was sufficient to overcome a motion to dismiss, where it described the relationships between the debtors and the alleged insiders demonstrating that the latter dominated and controlled the former).  Additionally, the complaint fails to set forth any allegations or facts regarding the capacity in which the defendant is an insider of the debtor, leaving the court to speculate as to nature

of their relationship and the plausibility that the defendant wielded sufficient control and authority over the debtor to warrant categorization as a nonstatutory insider.  Mr. Winslow, as the president and sole shareholder of the debtor, had significant control over the debtor's operations; however, the defendant was merely affiliated with the debtor through their financing and lending relationship.

Counts II and III of the complaint fail to state claims for avoidance and recovery of preferential transfers between ninety days and one year prior to the petition date because the trustee failed to plead facts sufficient to support the inference that the defendant is either a statutory or nonstatutory insider of the debtor.  Accordingly, Counts II and III are dismissed.

### III.  Avoidance and Recovery of Postpetition Transfer

Count V of the trustee's complaint seeks avoidance and recovery of $2,289,121.17 paid to the defendant from the proceeds of the sale of the debtor's granary facility and related property on September 29, 2010.  This court's order authorizing the distributions to the defendant, according to the trustee, is ambiguous as to whether or what portion of the proceeds from the sale, if any, were authorized.  The trustee contends that this ambiguity, along with the expedited basis upon which the motion for distribution was considered,[17] made the portion of the proceeds paid to the defendant subject to avoidance as unauthorized postpetition transfers pursuant to § 549.

Section 549(a) of the Bankruptcy Code provides that a trustee may avoid transfers or payments occurring after the commencement of the case, if not authorized either by the Bankruptcy Court or the court. 11 U.S.C. § 549(a)(2)(B).  The recovery of postpetition transfers requires, under

---

[17]The trustee contends that the motion for distribution, filed by the debtor and the Winslows, provided a substantially expedited notice period of forty–eight hours, rather than the two business days authorized by the court.  This expedited notice period, according to the trustee, left unsecured creditors with insufficient time to adequately investigate any potential recovery from the proceeds realized from the sale.

§ 549(a) of the Bankruptcy Code, the satisfaction of four elements: "(1) a transfer, (2) of property of the estate, (3) made after commencement of the case, and (4) that is not authorized under the Bankruptcy Code or by the bankruptcy court." In re Merry–Go Round Enters., Inc., 400 F.3d 219, 224 (4th Cir. 2005).

"Transfers authorized by the bankruptcy court, such as . . . "the granting of security interests and payments ordered by the court to employees of a chapter 11 debtor would also not be within the avoiding powers of the trustee." 5 Collier on Bankruptcy ¶ 549.04[4] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. rev. 2012). Although § 549 "gives the trustee broad power to avoid a transfer of property that occurs after the commencement of the case . . . . one class of transactions excepted from that power is transfers authorized by the court." Vogel v. Russell Transfer, Inc., 852 F.2d 797, 800 (4th Cir. 1988); Chattanooga Wholesale Antiques, 67 B.R. at 902 (concluding that the postpetition payments were authorized and, therefore, could not be recovered by the chapter 7 trustee under § 549(a)).

In Vogel, the Fourth Circuit held that § 549 of the Bankruptcy Code does not permit a trustee to avoid postpetition transfers where those sought to be avoided were authorized by the bankruptcy court. 852 F.2d at 800. Likewise, following confirmation of the debtor's plan of reorganization and conversion of case to chapter 7 in Chattanooga Wholesale Antiques, the trustee filed an adversary proceeding seeking to recover postpetition payments the debtor–in–possession made to Rossville Bank on the grounds that the payments were unauthorized because its claims were erroneously treated as secured. 67 B.R. at 901–02. Irrespective of the erroneous treatment provided to the claims of Rossville Bank, the court concluded that the trustee could not recover the payments under § 549(a) because "the payments were authorized by confirmation of the plan . . . ." Id. at 902.

31

The postpetition distribution to the defendant from the proceeds of the sale of the debtor's granary facility was specifically authorized by the court and, therefore, is not subject to avoidance by the trustee.  The trustee suggests that postpetition transfers, even those specifically authorized by the court after notice and hearing, are subject to avoidance where circumstances suggest that interested parties were not given a reasonable opportunity to scrutinize the transaction.  This interpretation would render authorization by the court and § 549 of Bankruptcy Code meaningless. FCC v. NextWave Personal Commc'ns, Inc., 537 U.S. 293, 302 (2003) (rejecting an interpretation of the Bankruptcy Code that would render its provisions inoperative or fortuitous).  Despite the trustee's argument to the contrary, the distribution order unambiguously states that the defendant is to receive a distribution of approximately $2,289,121.17, which would be applied towards the outstanding obligations and liens it held on the debtor's granary facility.  Alternatively, Count V must be dismissed because the allegations are not sufficient to give rise to the plausible belief that the court–authorized distribution to the defendant is avoidable as an unauthorized postpetition transfer pursuant to § 549.

## CONCLUSION

Based on the foregoing, the defendant's motion to dismiss the trustee's claims to avoid the fraudulent and preferential transfers, alleged in Counts I, II, III and IV of the complaint, on the grounds of equitable estoppel, quasi–estoppel and waiver is **ALLOWED.**  Additionally, the trustee is judicially estopped from asserting a claim to avoid the court–ordered distribution to the defendant as an unauthorized postpetition transfer and, therefore the defendant's motion to dismiss Count V of the complaint is **ALLOWED.**

Alternatively, the defendant's motion to dismiss the claims to avoid alleged preferential and

unauthorized postpetition transfers, contained in Counts II, III and V of the complaint, for failure to state a claim upon which relief can be granted are **ALLOWED.**

## END OF DOCUMENT